# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# CENTRAL DIVISION

JOSEPH D. AMRINE,             )
                              )
        Plaintiff,         )
                              )
       v.              )     Case No. 04-4300-CV-C-NKL
                              )
GEORGE BROOKS,           )
THOMAS J. BROWN,       )
JOHN C. HEMEYER, and   )
RICHARD LEE            )
                              )
        Defendants.     )

## ORDER

Missouri State Penitentiary inmate Gary Barber ("Barber") was fatally stabbed
during a recreation period on October 18, 1985. Fellow inmate Plaintiff Joseph Amrine
("Amrine") was convicted of that murder in 1986 and sentenced to death. Amrine's
direct appeals and post conviction relief efforts were unsuccessful until 2003 when the
Missouri Supreme Court reversed his conviction. The Missouri Supreme Court held that
"[a]lthough the evidence at trial was constitutionally sufficient to support the conviction,"
Amrine was entitled to habeas relief on the grounds of actual innocence because "[he]
was convicted solely on the testimony of three fellow inmates, each of whom have now
completely recanted their trial testimony." *State ex rel. Amrine v. Roper*, 102 S.W.3d
541, 548 (Mo. 2003). However, the court noted that due to the sufficiency of evidence
during the first trial, no double jeopardy attached and the state was free to prosecute

1

Amrine again if it thought it had sufficient evidence. The state declined to do so, and

Amrine was released. He subsequently sued Prosecutor Tom Brown, Brown's

investigator Richard Lee, then-Deputy Sheriff John Hemeyer, and Department of

Corrections Investigator George Brooks[1] for violations of his civil rights, conspiracy, and

malicious prosecution. All four Defendants move for summary judgment [Docs. ## 148,

151].

## I.    Factual Background

The parties include voluminous facts in their briefing. Only those facts relevant to

the Court's decision are set forth below. Where facts are in dispute, the Court assumes all

facts in favor of Amrine if a reasonable juror could find those facts based on the evidence

before the Court.

Housing Unit 5 of the Missouri State Penitentiary ("MSP") was a maximum

security facility housing serious offenders in 1985. The prison was a violent place and

several murders occurred there during the 1980s. Sometime in fall 1984, Amrine passed

out from "home brew" alcohol and was carried to his cell. His cell mate at the time was

Gary Barber. Later, Barber began spreading rumors around the prison that he had had sex

with Amrine in their cell while Amrine was passed out. The rumor resurfaced almost a

year later in early October 1985. Around the same time, inmate Randy Ferguson claims

---

[1]Brooks has since died and the action continues against his estate through his administrator Marilyn Schmutzler. To avoid confusion, the Court refers to Brooks throughout rather than his estate or its administrator.

2

that Barber attempted to coerce him into having sex. Ferguson told a powerful inmate named Clifford Valentine about Barber's coercion. Valentine provided protection to Ferguson at the time. However, Ferguson did not mention this to authorities until almost 13 years later.

On October 11, 1985, Amrine learned from inmate Terry Russell that Barber had revived the rumor that he had sexually assaulted Amrine while he was passed out. Russell and Amrine confronted Barber that day and Russell and Barber got into a fight. Guards separated them and sent both men to their cells until they signed a non-aggression pact. A week later, on October 18, all of these inmates were present in a recreation room in Housing Unit 5 for a one hour recreation period. The only way into or out of the room was a locked door monitored by corrections officers ("CO") Thomas Smith and John Noble. At some point, Noble saw Barber chasing another inmate toward him. Noble did not know the name of the person being chased at the time but later believed that it was Terry Russell. As Barber neared Noble, he dropped a weapon resembling an ice-pick and collapsed to the floor. Noble picked up the weapon, unlocked the door, and summoned CO Dobson for help. Dobson called for a stretcher and the prison unit was placed in lockdown, which means that no one could move from their present location. This would normally mean that no inmates could enter or leave a room unless escorted by a guard so corrections officers and law enforcement officials could obtain identifying information for the inmates in the room and take scene photos. As Barber was carried away on a stretcher, CO Bowers entered the recreation room and talked to Noble who pointed out

3

the inmate he thought Barber had been chasing. Bowers also noticed what he thought was blood on Ferguson's face. He took Ferguson, Valentine, and Russell to the captain's office.

Defendant George Brooks, a Missouri Department of Corrections investigator assigned to the penitentiary, was notified at approximately 2:30 p.m. that an assault had been reported. Brooks met briefly with CO David Dobson as Barber was carried by stretcher to the prison hospital where he was pronounced dead an hour later. Dobson advised him that CO Noble, who was monitoring the door to the recreation room at the time of the stabbing, had custody of an ice-pick type weapon. Brooks instructed Dobson to take custody of inmate Barber's clothing.

Brooks interviewed CO Noble who told him that he had been standing near the door when he observed Barber chasing another inmate, whom he believed to be Russell, toward the front of the room with something that looked like an ice-pick. Noble had collected the ice-pick, which appeared to have no blood on it. He gave the weapon to Brooks.

Brooks learned that three inmates, Randy Ferguson, Clifford Valentine and Terry Russell, had been escorted to segregation, and that Ferguson had blood on his face after Barber collapsed. Brooks went to the captain's office to see them. By that time, Captain Halliford could find no blood on Ferguson. Russell was also strip-searched but there were no signs of cuts or blood on him either. Ferguson told Brooks that he had been working out on a punching bag near the time Barber was stabbed. Brooks then went to

4

the scene of the stabbing and examined the area where Barber collapsed. He instructed

corrections officials to search the adjacent outdoor area and the inmates present in the

recreation room.

At some point, Brooks received a report from a confidential informant about the

fight a week earlier between Barber and Russell over the rumor that Barber had sexually

assaulted Amrine. The undisclosed informant also told Brooks that there was talk on the

day of the incident among unspecified inmates that Amrine was going to stab Barber.

Brooks reviewed a list of inmates present in the recreation room and determined that

Amrine's name was on that list. He asked that Amrine be brought to the Captain's office.

Inmate Jerry Poe was in his cell at the time and saw the guards come for Amrine and take

him to the Captain's office.

Cole County Sheriff Basinger and Deputy Sheriff Defendant Hemeyer arrived at

the MSP at approximately 4 p.m., just as Brooks was searching Amrine. Brooks

identified a red spot on the outer right leg of Amrine's pants and three small red spots on

his undershirt that he assumed but never verified to be blood stains. All the spots were

dry. Amrine's clothing was bagged and placed in the evidence locker. Amrine denied

any knowledge of the stabbing and said he was playing poker at the time. He did admit

that he and Barber had had a confrontation a week earlier when he learned from Russell

that Barber had told other inmates he had sexually assaulted Amrine. Amrine said he

confronted Barber with Russell's statements in Russell's presence, and when Barber

denied those statements, Russell and Barber fought. Brooks asked that Amrine be placed

5

in detention pending investigation for murder.

At approximately 5:35 p.m., Brooks, Basinger and Hemeyer interviewed inmate Terry Russell. Russell told the officers that Amrine had told him that he had intended to stab Barber on October 11, 1985, but that Russell's fight with Barber that day had prevented the stabbing. Russell reported to Brooks that on the day of the stabbing he was given permission to exit the recreation room by CO Noble before Barber collapsed to get aspirin. He said he got the aspirin from a guard in the control center who put it in a brown bag, and that Russell was still at the control center when Bowers's call for assistance came in. Russell said that Noble eventually let him back into the recreation room "after everybody left."

CO Bowers also told Brooks that he had observed Russell in an area outside the recreation room shortly after Barber collapsed, but he saw Russell back in the room a short time later. Russell told Brooks that when he reentered the room after the stabbing, Amrine told him that he had stabbed Barber. These claims are suspicious given the lockdown that purportedly followed the stabbing, making it unlikely that Russell could have left the control center, let alone gotten back in the recreation room. In 2006, Noble testified that his hand-written report stating that Russell was in the room at the time of the stabbing may have been amended in its final typed form without his knowledge, but there is no evidence who, if anyone, changed the report. No attempt was made by any of the Defendants to further investigate Russell's whereabouts during the time of the stabbing other than CO Bower's and Dobson's statements that they had seen Russell outside the

6

room.

Brooks and Hemeyer interviewed Amrine a second time at approximately 10:30 p.m. During that interview, Defendants asked him a series of questions designed to make him eligible for the death penalty. None of the death penalty-qualifying questions had been asked of any other inmate. Amrine again denied that he had stabbed Barber and maintained he was playing cards with inmates Willis, Jordan, Ball and Crume. Brooks asked Amrine to submit to a polygraph examination, but Amrine refused, even though he had agreed to take polygraph tests in the past, because he no longer trusted them.

On October 19, inmate Poe contacted corrections officials, indicating he had information about the stabbing and that he was in fear for his life. He had seen Amrine taken from his cell to the Captain's office after the stabbing and knew that he was being investigated. Poe, who is white, had recently been transferred to MSP from another facility and he told guards that unidentified black inmates had threatened him because he had witnessed the murder. He gave a statement on October 21 that he had seen Barber's stabbing and seen Barber chase the inmate who had stabbed him around the room. Many of the factual assertions in Poe's account were inconsistent with other versions of events Brooks and Hemeyer had heard from other sources. For example, he said that someone had rolled Barber over after he was stabbed and cleaned blood off his face with a white towel. No one else mentioned this and no towel was found, although Defendants made no effort to find the towel. Poe also said that the weapon was dropped in a group of inmates before Barber started chasing Amrine. No attempt was made to verify any of

7

these inconsistent claims.

After Poe's narrative, Defendants showed him pictures of various inmates ranging from recent to several years old. He identified an eight-year-old photograph of Amrine as the inmate he "want[ed] to say" was the stabber but that he "c[ould]n't be positive." The officers asked him to turn the picture over and read how old it was. Amrine's name was written on the back and after seeing it, Poe seemed more confident that it was the correct picture. He also stated that later he saw officers "bring the inmate that [he] saw stab Barber" back to level two of Housing Unit 5A.

On October 22, Russell took a polygraph test, as he had agreed to do during his initial statement on October 22, the results of which were largely interpreted as truthful by the examiner. In particular, the examiner interpreted the following questions as answered truthfully:

Do you know for sure who killed Fox Barber? Yes.

Did you kill Fox Barber? No.

Did you know Fox Barber was going to be stuck? Yes.

Did you see Fox Barber at the time he was stuck? No.

Have you told Officer Brooks the entire truth about the Fox Barber killing? Yes.

Are you now withholding any information whatsoever about who killed Fox Barber? No.

There is some evidence that Russell may have been asked whether he was in the room at

8

the time of the stabbing and that his answer in the negative was interpreted as not truthful, but the list of questions asked is incomplete in the record.

That same day, Brooks interviewed inmates Dodson, Willis, Jordan, Crume, Ball and Hines, but none admitted that he had seen the stabbing. Crume and Hines reported seeing Barber chase Amrine from the back of the multi-purpose room. Willis told Brooks that Barber approached a group of inmates, including Amrine, and said "You know I'm going to kill you" to one of the inmates in that group. Dodson and Jordan told Brooks that Amrine was playing poker with them when Barber collapsed.

On December 2, Brooks sent a memorandum to warden Bill Armontrout outlining his investigation and concluding that

> It appears inmate Amrine did stab Barber, causing Barber's death. The motive for the assault was apparently Amrine's belief that Barber was telling other inmates that he had attempted to have sex with Amrine while the two inmates were cell-mates in general population.

A Cole County grand jury indicted Amrine for Barber's murder on December 19.

On January 24, 1986, Brooks interviewed Jordan again. This time, Jordan said that Amrine had stabbed Barber in the back as he passed a pillar in the recreation room next to the punching bag. He said Barber turned and chased Amrine but Amrine evaded him and Barber collapsed.

In preparation for trial in 1986, Cole County Prosecutor Tom Brown sent his investigator Richard Lee to re-interview all the inmates who were present in the recreation room during the stabbing in preparation for trial. Brooks accompanied him.

9

On April 8, 1986, Brooks and Lee interviewed inmate Wayne Garrison.  The first time he

was asked whether he saw who stabbed Barber, Garrison replied, "No, not really, I just

seen him chasing Joe [Amrine] with the knife."  However, later in the interview Garrison

had the following exchange with Brooks and another investigator named Dearixon:

> GARRISON:  . . . . Joe killed him.

> DEARIXON:  Did you actually see–

> GARRISON:  Stood right there and watched him.

> DEARIXON:  –stab him?

> GARRISON: Yeah.  Yeah, I sat right there and watched the whole thing.

> BROOKS: Where did he stab him at?

> GARRISON: In the back.

> BROOKS: Where was Barber standing at?

> GARRISON: Back against the wall.

They interviewed inmate Henry Belk on April 9, who told him that

> when everybody went to hollering I turned from the table.  Barber be
> behind Joe Amrine with a knife.  What happened before that I didn't get a
> chance to see that. . . . All I seen was [Barber] running [undiscernable] 'I'm
> going to kill you.'  At the time they done got over there by the door, by the
> officer.  Fell.  Joe came over there and set down right side of me.  Took a
> red handkerchief, tied it around him.

They attempted to record an interview with Randy Ferguson, but he denied any

knowledge of the stabbing.  Lee has testified that after the tape recorder was turned off,

Brooks asked Ferguson, "Randy, you saw this happen, didn't you?"  Ferguson responded,

"Yeah, Brooks, I saw it," and then said he might be willing to testify if they could make a deal.  Ferguson was near the end of his sentence but he had a weapons charge pending and he had been told he might face up to another 30 years.  In exchange for his testimony, Prosecutor Brown dropped the weapons charge.  On April 17, 1986, Lee and Brooks interviewed Ferguson again.  This time, Ferguson told them that, prior to Russell and Barber getting sent to detention for fighting a week before the stabbing, he had overheard Amrine speaking to another inmate named Joe Moore.  Moore told Amrine that if someone said the things about him that Barber had said about Amrine, he would kill him.  Amrine replied, "don't think like that, that ain't what I plan to do."

Ferguson told Brooks that the day before Barber and Russell fought, Amrine was discussing with several other inmates his plans to stab Barber the next day.  According to Ferguson, Amrine tried to stab Barber the next morning as planned but Barber saw him coming and started a fight with Russell which drew the guards and prevented the stabbing.  Ferguson said that after Russell and Barber were released from detention for fighting, he heard inmate Hines trying to talk Amrine out of stabbing Barber but Amrine said Barber had disrespected him too much to forget about it and that he had a stabbing coming.  Ferguson said that on the day of the stabbing he saw Amrine get an ice-pick like weapon from another inmate, tuck it into his waistband, approach Barber, walk around with him for a while and even put his arm around Barber's shoulders.  Then, according to Ferguson, Amrine stabbed Barber in the back and ran as Barber chased him and then collapsed.  As with Poe's account of the murder, there were several details of Ferguson's

account that did not match other witnesses' but Brooks and Lee did not attempt to investigate the discrepancies.

Amrine was convicted of Barber's murder on April 30, 1998, based largely on the testimony of Russell, Ferguson, and Poe. His direct appeal and post conviction relief attempts were unsuccessful until these witnesses eventually recanted their testimony and Amrine was released by the Missouri Supreme Court in 2003.

At the time of the murder, Defendant Hemeyer was deputy sheriff of Cole County. Hemeyer would become sheriff himself in February 1996 upon Sheriff Basinger's death. After the murder, Hemeyer generated an offense report for the purpose of documenting his involvement in the investigation and providing information to the sheriff. Although Amrine concedes that some of the statements attributed to him in the offense report were accurately recorded, others were not. The report misquotes Amrine as saying that Barber was a low-life, that Amrine was way above Barber, and that Barber wasn't worth it. It also misquotes him as saying that if he wanted Barber killed, he could have had someone else do it without dirtying his owns hands.

Defendant Richard Lee was employed as an investigator for the Cole County Prosecuting Attorney, Defendant Tom Brown. Lee understood his job responsibilities to include acting as a liaison between the prosecutor's office and the law enforcement community and assisting in preparing cases for trial. Brown typically asked his investigators to help him prepare a few weeks before trial in murder cases involving the Department of Corrections by interviewing witnesses listed as defense witnesses or re-

12

interviewing witnesses who initially refused to give a statement to see if they had changed their mind. Just a few weeks before the Barber murder trial, Brown asked Lee to re-interview the inmate witnesses.

Plaintiff Amrine was in Missouri State Penitentiary (MSP) as a result of several charges, including first degree robbery, burglary and stealing. He had entered a guilty plea for unlawful use of a weapon or possession of a weapon in a prison. The weapon was a homemade knife. Amrine was known as "Broadway Joe" and "Joe the Boss" and he had a reputation as a predator inmate. He was accused of involvement in three or four stabbings prior to 1985 and admitted to stabbing Inmate Vincent Bell. He admits that it was easy for him to get a shank or a knife and that he typically had one, even in supermax, because it was easy to sneak one past the officers. He was caught with a knife on at least two occasions while in the supermax unit at MSP.

## II.     Discussion

### A.     Absolute Immunity

A prosecutor enjoys absolute immunity for acts performed in initiating a prosecution and in presenting the State's case. *Reasonover v. St. Louis County*, 447 F.3d 569, 579-580 (8th Cir. 2006) (internal quotations omitted). "Functions intimately associated with the judicial phase of the criminal process as opposed to investigative police work or administrative duties are absolutely shielded from liability under section 1983 claims." *Id.* (internal quotations omitted). "Immunity is not defeated by allegations of malice, vindictiveness, or self-interest," *Reasonover*, 447 F.3d at 580. Even if a

13

prosecutor "knowingly present[s] false, misleading, or perjured testimony, or even if he with[holds] or suppresse[s] exculpatory evidence, he is absolutely immune from suit." *Id.* However, "administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). For example, if a prosecutor undertakes some action normally performed by a detective or a police officer like planning and executing a raid on a suspected weapons cache, he "has no greater claim to complete immunity than activities of police officers allegedly acting under his direction." *Id.* at 273-74.

A prosecutor's interviewing of witnesses is prosecutorial rather than police work. *Reasonover v. St. Louis County*, 477 F.3d 569, 579-80 (8th Cir. 2006). As the Eighth Circuit has explained, "Not all of an advocate's work is done in the courtroom. For a lawyer to properly try a case, he must confer with witnesses, and conduct some of his own factual investigation." *Id.* (quoting *Cook v. Houston Post*, 616 F.2d 791, 793 (5th Cir. 1980)).

Amrine contends that Brooks's final investigative report as presented to Brown overlooked many inconsistencies in various witnesses' statements and did not support probable cause for Amrine's prosecution. Accordingly, Amrine argues that Brooks had a duty to investigate further and any such investigation–or more importantly, his failure to conduct such investigation properly–falls within the investigatory functions exception to prosecutorial immunity. If that argument were to succeed, however, the investigatory

14

function exception to prosecutorial immunity would swallow the rule. Prosecutorial immunity protects even those prosecutors who suborn perjury and intentionally withhold exculpatory evidence from defendants. *Reasonover*, 447 F.3d at 580. Such conduct may result in an overturned conviction but it does not subject the prosecutor to personal liability. Under Amrine's expansive interpretation of the investigatory function doctrine, a prosecutor who negligently fails to investigate whether a complaining witness is lying or who fails to uncover exculpatory evidence himself could be held personally liable. Amrine cannot circumvent a doctrine which protects even the wicked by inventing a duty in the merely negligent to avoid conduct that would be immune from suit if done intentionally. Whatever further investigation Brown did or should have done in preparation for trial was no less a prosecutorial function than prosecuting the trial itself. Because he is immune from suit, summary judgment will be granted on Count I.

A prosecutor's absolute immunity also extends to the investigators who work for him, shielding their actions taken in connection with a criminal prosecution. *Keating v. Martin*, 638 F.2d 1121, 1122 (8th Cir. 1980). The evidence gathered by Brown's investigator, Lee, in the weeks leading up to the trial was obtained in the context of re-interviewing potential witnesses for trial. It was during that time that Ferguson made his deal to testify in exchange for his statement about Amrine. Even if Brown knew that Ferguson's statement was untruthful, the deal and the interview itself were still done in preparation for trial and were not investigative functions. *See Reasonover*, 447 F.3d at 580. As Lee is therefore immune from suit, summary judgment will be granted to him on

15

Count I as well.

Finally, "a prosecutor is absolutely immune from a civil conspiracy charge when his alleged participation in the conspiracy consists of otherwise immune acts." *Id.* Since the conspiracy charge against Brown and Lee in Count II relates only to the immune conduct discussed with regard to Count I, they are absolutely immune from suit for conspiracy as well. Summary judgment is therefore granted to Brown and Lee on Count II.

### B. Qualified Immunity

While police officers do not enjoy the same absolute immunity from suit as judges and prosecutors, they may still be entitled to qualified immunity, which "provide[s] ample room for mistaken judgments and . . . protect[s] all but the plainly incompetent or those who knowingly violate the law.*" Frye v. Kansas City Missouri Police Dep't*, 375 F.3d 785, 789 (8th Cir. 2004). This defense "allows officers to make reasonable errors so that they do not always err on the side of caution." *Habiger v. City of Fargo*, 80 F.3d 289, 295 (8th Cir. 1996). The Court analyzes the defense of qualified immunity in a two step process: (1) did the defendants violate a constitutional right; and if so (2) was the right clearly established at the time such that a reasonable officer would have understood that his conduct violated the Constitution? *Washington v. Normandy Fire Prot. Dist.*, 272 F.3d 522, 526 (8th Cir. 2001).

Exactly which rights Amrine seeks to vindicate in this suit is somewhat murky. In his Amended Complaint, he alleges violations of his right to a fair trial and his right to be

16

free from wrongful prosecution and conviction,[2] both of which he labels as violations of procedural due process. Amend. Compl. ¶¶ 55-60. In Defendant Brooks's Motion for Summary Judgment, Brooks also characterizes Count I as alleging that Defendants violated Amrine's "procedural due process right to a fair trial by not conducting an adequate investigation, failing to properly preserve blood evidence, and coercing, coaching, and fabricating false testimony by inmate witnesses Russell, Ferguson, and Poe." Brooks Mot. for Sum. Judg. at 18. Brooks claims in a footnote that Amrine has not raised a substantive due process claim, *Id.* at n. 3, which Amrine did not dispute in his original Suggestions in Opposition. However, during oral argument on Defendants' fully briefed motions for summary judgment, Amrine indicated for the first time that he considers his due process claim to be both procedural and substantive. He has since submitted Supplemental Suggestions in Opposition [Doc. # 182], without leave from the Court to do so, arguing that his failure to plead substantive due process should not matter because he has produced evidence to support such a claim and the Defendants had notice of that evidence. In the alternative, he has also filed a Motion to Amend his Complaint [Doc. # 183] to add a Count for substantive due process.

Defendant Brooks has moved to strike the Supplemental Suggestions [Doc. # 185]

---

[2]He also invokes Art. I § 10 of the Missouri Constitution, but violations of state law rights cannot be vindicated in a § 1983 action. *Ebmeier v. Stump*, 70 F.3d 1012, 1013 (8th Cir. 1995) ("violations of state laws, state-agency regulations, and, more particularly, state-court orders, do not by themselves state a claim under 42 U.S.C. § 1983").

as untimely and opposes the Motion to Amend.  He notes that neither he nor the other

Defendants have had an opportunity to brief any substantive due process claim in their

motions for summary judgment.  The Court agrees that it would be unfair to rule the

pending motion for summary judgment as if the operative complaint contained a

substantive due process claim without affording the Defendants an opportunity to brief

the issues.  The Court will therefore strike Plaintiff's Supplemental Suggestions and rule

the pending summary judgment motion on the existing claims pleaded in the Amended

Complaint.  The Court will then entertain Plaintiff's Motion to Amend in a separate

Order.

In his original briefing on Defendants' Motions, Amrine describes his § 1983

claims as seeking redress for violations of his (1) freedom from wrongful conviction and

incarceration, (2) right to a fair trial, and (3) freedom from detention, arrest, or

prosecution except upon probable cause.  *Id.* at 115.  The Court construes Amrine's

Amended Complaint liberally to allege violations of (1) his Fourth and Fourteenth

Amendment right to be free of arrest and prosecution without probable cause, and (2) his

Sixth and Fourteenth Amendment right to a fair trial, which he alleges to have been

violated by Defendants' reckless investigation, failure to preserve evidence, and

fabrication of false testimony.  The Court must first determine whether these rights were

violated by Defendants Brooks and Hemeyer before determining whether the contours of

the rights at issue were so clearly established in 1985 that the officers knew that they were

violating Amrine's rights.

18

## 1.    Prosecution without Probable Cause

The Fourteenth Amendment incorporates the Fourth Amendment's guarantee that "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures, shall not be violated . . . but upon probable cause."  U.S. Const. amend. IV; *Wolf v. Colorado*, 338 U.S. 25 (1949).  However, "[t]he Constitution does not guarantee that only the guilty will be arrested.  If it did, § 1983 would provide a cause of action for every defendant acquitted -- indeed, for every suspect released."  *Baker v. McCollan*, 443 U.S. 137, 145 (1979).  Thus, "the relevant inquiry in a Fourth Amendment . . . claim is whether the officers had probable cause."  *Anderson v. Larson*, 327 F.3d 762, 770 (8th Cir. 2003) ("A claim of false arrest brought pursuant to § 1983 fails if the officer had probable cause to make the arrest."); *Smithson v. Aldrich*, 235 F.3d 1058, 1064 (8th Cir. 2000).

Probable cause to arrest exists "if the facts and circumstances within the law enforcement officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed . . . an offense."  *United States v. Brown*, 49 F.3d 1346, 1349 (8th Cir. 1995). In this analysis, police are given

> substantial latitude in interpreting and drawing inferences from factual
> circumstances, but such latitude is not without limits.  First, because the
> totality of circumstances determines the existence of probable cause,
> evidence that tends to negate the possibility that a suspect has committed a
> crime is relevant to whether the officer has probable cause. An officer
> contemplating an arrest is not free to disregard plainly exculpatory
> evidence, even if substantial inculpatory evidence (standing by itself)

19

suggests that probable cause exists. In this sense, the Fourth Amendment requires that [the court] analyze the weight of all the evidence--not merely the sufficiency of the incriminating evidence--in determining whether [an officer] had probable cause to arrest . . . .

*Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999) (internal citations omitted).

Accordingly, "law enforcement officers have a duty to conduct a reasonably thorough investigation prior to arresting a suspect, at least in the absence of exigent circumstances and so long as law enforcement would not be unduly hampered if the agents wait to obtain more facts before seeking to arrest." *Id.* (internal quotations omitted). "An officer need not conduct a mini-trial before making an arrest, but probable cause does not exist when a minimal further investigation would have exonerated the suspect." *Id.* (internal citations omitted). Lastly, the subjective intent of the arresting office is irrelevant. *See Whren v. United States*, 517 U.S. 806, 813 (1996); *United States v. Clarke*, 110 F.3d 612, 614 (8th Cir. 1997) ("In analyzing [defendant's] ... arrest under the fourth amendment, we ... ignore the officers' subjective intentions and focus solely on the objective question of whether probable cause existed."). Thus, there is probable cause if a reasonable officer, acting on all the information the arresting officer had or could have had after a reasonable investigation, would have been warranted in the belief that the suspect committed the crime alleged.

The information presented in Brooks's final report to Brown was sufficient to establish probable cause as evidenced by the grand jury indictment based on that same evidence three weeks later. *See Moran v. Clarke*, 296 F.3d 638, 657 (8th Cir. 2002)

20

(noting that the "return of an indictment by a grand jury is prima facie evidence of probable cause"). The information Brooks and Hemeyer obtained later in helping Brown and Lee prepare for trial bolstered the probable cause determination even more as evidenced by the guilty verdict returned at Amrine's criminal trial. Nevertheless, Amrine contends that both the evidence in Brooks's report and that which was presented at trial was incomplete because Defendants conducted a reckless investigation and therefore was insufficient to establish probable cause. The Court must therefore determine whether there would still have been probable cause to support Amrine's prosecution had Brooks and Hemeyer discovered (and reported to Brown) all the additional evidence Amrine alleges they could have obtained with only minimal further investigation.

Even considering this additional evidence, the Court concludes that a reasonable investigator would have been warranted in the belief that Amrine murdered Barber. There is no dispute that Amrine had a motive to kill Barber. Russell told Brooks that Amrine intended on two occasions to kill Barber, including the day of the murder, and that Amrine confessed to Russell that he had killed him afterward. Had Brooks further investigated Russell's claim that he was out of the room at the time–which was contradicted by CO Noble's belief that Russell was the inmate Barber chased after he was stabbed–Brooks would still have had the statements of two guards who said they saw Russell outside the room. Although Poe's account of the crime may have been strongly undermined by his schizophrenia, by having seen Amrine taken from his cell for questioning after the murder, and by the fact that he saw Amrine's name on the back of a

21

picture which he thought was the killer's, there would remain the eventual statements by Jordon, Garrison, and Belk that Amrine was the inmate who Barber was chasing after he was stabbed. Finally, there would still be the eventual statement by Ferguson that Amrine was the killer. Even acknowledging that the statement was given in exchange for dropping the weapons charge and that it contained some inconsistencies with Poe's version of the murder, there would still have been probable cause. No one other than Amrine appeared to have a motive. No witnesses said anyone other than Amrine had stabbed Barber. The only evidence suggesting anyone else was responsible was the equivocal belief by CO Noble that it was actually Russell being chased, but two other officers placed Russell outside the room.

Moreover, even if actual probable cause were questionable under the totality of circumstances in this case, qualified immunity from suit for Fourth Amendment violations requires only a showing of *arguable* probable cause. *Smithson v. Aldrich*, 235 F.3d 1058, 1062 (8th Cir. 2000) ("[L]aw enforcement officers are entitled to qualified immunity if they arrest a suspect under the mistaken belief that they have probable cause to do so–provided that the mistake is objectively reasonable.") (*quoting Hunter v. Bryant*, 502 U.S. 224, 228-29 (1991)). "The issue for immunity purposes is not probable cause in fact but arguable probable cause." *Id.* At the very least, Brooks and Hemeyer had arguable probable cause and would have even if their investigation had been more thorough. Because there was probable cause for Amrine's arrest and prosecution, there was no violation of his Fourth Amendment rights and summary judgment on that theory is

warranted.

## 2. Right to a Fair Trial and Reckless Investigation

Amrine also alleges that his Sixth and Fourteenth Amendment right to a fair trial was violated by Defendants' reckless investigation, failure to preserve evidence, and fabrication of false testimony. Again the Court first considers whether Defendants violated these rights before determining whether they were clearly established in 1985.

As to the fabrication of false testimony theory, Amrine has presented no evidence that either Brooks or Hemeyer fabricated evidence or obtained testimony they knew to be false. The statements of Russell and Poe, while inconsistent in certain details, were not obviously false. *C.f. Moran v. Clarke*, 296 F.3d 638, 640 (8th Cir. 2002); *Wilson v. Lawrence County*, 260 F.3d 946, 954 (8th Cir. 2001). Poe's identification of Amrine, as discussed in greater detail below, is irregular and troubling, but to the extent that there was willful fabrication involved, Poe was the culpable party. While Brooks and Hemeyer may have had cause to doubt parts of Poe's account and the certitude with which he eventually named Amrine after seeing his name on the picture, no reasonable juror could find that they tried to get Poe to make an identification that they thought was false. Similarly, the evidence that Brooks elicited a statement from Ferguson does not show any attempt to convince Ferguson of something Brooks knew to be false. After Ferguson claimed ignorance, Brooks went off the record and asked, "Randy, you saw this happen, didn't you?" To which Ferguson responded, "Yeah, Brooks, I saw it." The statement that followed Ferguson's dropped weapons charge was no doubt self-serving, but there is

23

no evidence that Brooks or Hemeyer believed that Ferguson was lying. As there is no evidence that either Defendant fabricated false testimony, there was no violation of Amrine's fair trial rights in the collection and presentation of such testimony.

The crux of Amrine's reckless investigation theory is that Brooks and Hemeyer did not conduct a thorough investigation and made no effort to verify suspicious or implausible witness statements including those of Russell, Poe, and Ferguson. The Eighth Circuit has held that the recklessness of a police investigation may so shock the conscience as to violate substantive due process, *see Moran v. Clarke*, 296 F.3d 638, 646 (8th Cir. 2002); *Wilson v. Lawrence County*, 260 F.3d 946, 955 (8th Cir. 2001), but Amrine did not plead a substantive due process claim in his Amended Complaint; Count I seeks relief only for a violation of procedural due process.[3]

The Eighth as well as other Circuits have found violations of procedural due process where the police have withheld exculpatory evidence from prosecutors in bad faith. *See Villasana v. Wilhoit*, 368 F.3d 976, 979 (8th Cir. 2004); *Newsome v. McCabe*,

---

[3]Procedural due process is concerned with whether a party has had the benefit of adequate procedural safeguards before a deprivation of liberty or property. *See Parrish v. Mallinger*, 133 F.3d 612, 615 (8th Cir. 1998) ("A procedural due process claim focuses not on the merits of a deprivation, but on whether the State circumscribed the deprivation with constitutionally adequate procedures."). By contrast, substantive due process is violated where the state's deprivation of certain fundamental liberty interests is so shocking to the conscience that no amount of procedural safeguards would pass constitutional muster. *See Reno v. Flores*, 507 U.S. 292, 301-302 (1993) (A "'substantive due process' claim relies upon our line of cases which interprets the Fifth and Fourteenth Amendments' guarantee of 'due process of law' to include a substantive component, which forbids the government to infringe certain 'fundamental' liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.").

256 F.3d 752 (7th Cir. 2001); *Jean v. Collins*, 221 F.3d 656, 659 (4th Cir. 2000) (Wilkinson, C.J., concurring). But there is no evidence that the Defendants in the present case ever withheld any evidence they had obtained, much less that they did so in bad faith. The only credible allegations focus on reckless and insufficiently thorough police work; however, this Court is unaware of any decisions in this or any other circuit holding that a failure of police to follow up on possible leads or to corroborate witnesses' statements, even if done recklessly, is alone sufficient to deprive a suspect of his procedural due process right to a fair trial. The weakness of the government's investigation is often at the center of a criminal defendant's defense, but if that defense is successful, it does not mean the defendant has a civil cause of action for a reckless investigation.

But even assuming that such a theory were cognizable under 42 U.S.C. § 1983, no reasonable juror could find on the evidence before the Court that Defendants' reckless police work deprived Amrine of a fair trial. Viewing the evidence in the light most favorable to Amrine, a reasonable juror could find that Russell's account of his location outside the recreation room at the time of the stabbing was sufficiently detailed that the officers could have interviewed the sergeant and the inmate Russell said he was speaking with at the time of Bowers's call for help. Perhaps Defendants felt this follow-up was unnecessary given Bowers's and Dobson's statements that they had seen Russell outside the recreation room at the time of the stabbing; however, given Noble's belief that Russell was the inmate whom Barber chased before collapsing, a reasonable juror could conclude

25

that it would have been prudent to reconcile the inconsistencies.

A reasonable juror might also be troubled by the photo identification process used with Poe.  Brooks showed Poe over twenty pictures of widely different ages, all of which had the names of the inmates on the back.  After Poe made an equivocal identification of Amrine, Brooks suggested to Poe that he turn the picture over to see the date which also showed Poe Amrine's name.  A reasonable juror might conclude that Poe's entire identification was undermined when Poe became more definite about his identification only after seeing Amrine's name on the back of his picture.   Still further, there were alleged facts such as the existence of a bloody towel and the help of another inmate in obtaining the shiv used on Barber that the officers could have attempted to corroborate, particularly if it suggested that Amrine had an accomplice.  And although Brooks spotted what he thought were blood stains on Amrine's clothes, the stains were never analyzed. Nonetheless, Amrine has presented no evidence that he was unaware of or unable to present evidence at trial of these deficiencies in Defendants' investigation or the allegedly recklessness manner in which they conducted it.

*Villasana, Newsome,* and *Jean* are inapposite to the present case because, unlike those cases, Amrine has not alleged that the police withheld any exculpatory evidence from prosecutors, the unavailability of which rendered his trial unfair.  His only credible allegations amount to a failure to do satisfactory police work, but any such deficiencies in Defendants' investigation were known to Amrine at the time of his trial and could have been or were presented to the jury.  As the Court has discussed above, even if the police

26

had conducted as thorough an investigation as Amrine alleges they should have, there still would have been probable cause for his prosecution. His trial was not rendered fundamentally unfair by any recklessness in the investigation.

Finally, if there is in fact a procedural due process right to be free from reckless investigatory police work, Amrine has failed to demonstrate that the right was clearly established in October 1985. *See Sparr v. Ward*, 306 F.3d 589, 593 (8th Cir. 2002) (noting that although qualified immunity is an affirmative defense for which the defendant carries the burden of proof, the burden is on the plaintiff to demonstrate that the law was clearly established). Thus, under either step of the qualified immunity analysis, Defendants are entitled to immunity.

### 3. Conspiracy

In Count II, Amrine alleges that Brooks and Hemeyer conspired to deprive him of his constitutional rights. To prove a § 1983 conspiracy claim, a plaintiff must show: (1) that the defendants conspired to deprive him of a constitutional right; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff. *Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999). Most importantly, "the plaintiff is additionally required to prove a deprivation of a constitutional right or privilege in order to prevail on a § 1983 civil conspiracy claim." *Id.*

Because the Court has granted summary judgment to Defendants on all of Amrine's theories of liability under 42 U.S.C. § 1983 in Count I, he cannot show a

constitutional deprivation. His conspiracy claim therefore fails for want of a constitutional violation and summary judgment is warranted on Count II as well.

### C. Malicious Prosecution

In addition to his federal claims, Amrine raises a common law claim for malicious prosecution. Under Missouri law, malicious prosecution requires proof of six elements: (1) the commencement of a prosecution against the plaintiff; (2) instigation by the defendant; (3) termination of the proceeding in favor of the plaintiff; (4) the want of probable cause for the prosecution; (5) that the defendant's conduct was actuated by malice; and (6) that the plaintiff was damaged. *Cassady v. Dillard Dep't Stores*, 167 F.3d 1215, 1219 (8th Cir. 1999). As the Court has already ruled, probable cause existed for Amrine's prosecution even with the additional evidence Amrine argues the Defendants would have obtained through a more thorough investigation. Since Amrine cannot establish a want of probable cause, summary judgment will be granted to all Defendants on the malicious prosecution claim.

### III. Conclusion

Accordingly, it is hereby

ORDERED that Defendant Brooks's Motion to Strike Amrine's Supplemental Suggestions in Opposition [Doc. # 185] is GRANTED. It is further

ORDERED that Defendants' Motions for Summary Judgment [Docs. ## 148, 151] are GRANTED.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

DATE:  February 6, 2007
Jefferson City, Missouri

29